Mr. Smikin, we will hear from you. Good morning, Your Honors, and may it please the Court. My name is Michael Smikin. I represent the appellant in this matter, and I'm going to very briefly create a little bit of context of the three or four issues I'm going to try to get to, unless there's specific issues I can address for the Court. The first issue I'm going to try to get to is to discuss the fact that there was a material breach of a settlement agreement, which excused my client from further performance under that contract. The District Court erred by not looking at that particular issue, and instead focusing on one specific issue, and that is essentially the agency relationship of the breaching party. Second, I'm going to discuss the actual interpretation that the Court used when looking at the material non-disparagement provision. There's two essential interpretations that the Court used. First, in a clear record at the motion-to-dismiss stage, where the Court explained one interpretation of the non-disparagement provision, and then later, for the motion for summary judgment, a second interpretation of the non-disparagement provision. The reason that I highlight that is that if there's two different interpretations for the same contractual provision, as a matter of law, that cannot be decided at the summary judgment phase. It is a question of fact that must be submitted either to the jury or upon agreement by — at a bench trial. That's not what happened here. There was a determination made using one interpretation, which differed from the Court's earlier interpretation, demonstrating at best there was an ambiguity that should have been submitted to a fact finder and not decided at the motion for summary judgment phase, especially before discovery had occurred, and over objections to evidence that was coming in at the motion for — Why is an interpretation of legal text a legal issue? So the interpretation, Your Honor, of a contract would be an issue for the Court to determine. However, if there's an ambiguity in how to interpret it and there's more than one reasonable interpretation of that provision, it becomes a question of fact specifically. And I believe the Fifth Circuit has spoken twice on that issue that we highlighted inside of our papers. I believe that's the Fireman case, which we cited, and also I think it's the Turin-Baniff case. What makes this interpretation — what makes this particular provision ambiguous? Sure. So, Your Honor, if I can just very briefly read from the Court's own order, this is the District Court's order, it's Docket 75, the record on Appeal 313. The Court says here, the Court finds that the nondisparagement provision identifies all of the parties who are prohibited from criticizing or disparaging, quote, any of, close quote, the parties identified in the provision, and that the parties were prohibited from taking a number of disparaging actions, including making statements about, quote, any party, close quote, that is unflattering or disparaging. When you go to the summary judgment standard, the Court then focused almost exclusively on the breaching party, and there's no question about this, that Mr. Rhodes had breached the nondisparagement provision. The Court found it, the Court entered an injunction against him, he was held in contempt three times for it, and the District Court judge herself indicated that this is not a dispute by the parties. So Mr. Rhodes breached. When we get to the motion for... The question for us, I take it, is whether Berger is on the hook for that disparagement. And I believe that's exactly what the Court attempted to do by saying, well, Gary Rhodes is over here and he's an agent of, or the allegation is he's an agent of, or an owner of, but did he act on behalf of? But what the Court failed to do was to recognize that not only was Mr. Rhodes an owner of Osteofit, where, under which he performed her analysis, he was also a party to the settlement agreement. He was a signer of the settlement agreement. He agreed to follow through on the nondisparagement. I understand the Berger guarantee covers obligations of the franchisee, not of Rhodes. That is not our position, Your Honor. What I would like to... I understand it's not your position, but how do we ignore that text? Yeah, sure. So if you actually... I get that you dispute that. With that, Your Honor, I just wanted to be clear on that issue. If you actually go to paragraph 13 of the, what we refer to as the Spain settlement agreement, paragraph 13 actually includes two guarantee provisions, 13a and 13b. The one that's relevant here for purpose of our discussion is 13b, but I'm going to come back to 13a because it's very important. 13b specifically says, Charles Berger and Ronald Berger shall each personally and jointly and severally guarantee the obligations under this agreement for the repayment of the reserve amount, which is discussed in section 11, and any confidentiality, nondisparagement and noncompete obligations. There is... I understand that, and that's an interesting and reasonable argument. The question is, how do we read it against the first paragraph of section 13? That makes an explicit reference to Exhibit A. Well, it does, Your Honor, but it's a separate document. It's a guarantee that's signed and executed separately, and if you look at the Ashcraft case, Ashcraft talks about how guarantees are viewed as separate from the primary obligations. So the Spain settlement has a primary obligation. It's very specific, 13a, 13b. 13a is very circumscribed. It's KZ, which stands for Kyle Zagrotzky, Austria Strong Franchising LLC, and Blue Ocean shall each personally, jointly, as to the actions of the franchisor. 13b does not... In other words, you agree that Exhibit A, the guarantee included in Exhibit A, would not provide the guarantee you're seeking here. You're saying that section 13 adds a new guarantee. Correct. They're two separate and distinct guarantees. Why would Berger want to guarantee parties that... I suppose it makes sense for Berger to guarantee disparagement by his own company. I guess it's a bit heroic to think that he would have guaranteed other conduct outside of his own organization. So in order to understand the actions, first of all, we would need to get inside their head. We'd need to ask them what their intentions are, something that the court didn't do for... It just seems unlikely to me that... I can see why Berger would guarantee Osteofit, would be asked to guarantee Osteofit, right? Because Osteofit is basically Berger's company. They own 90%. It's a bit less likely to me why Berger would be asked to and would agree to guarantee somebody else who he had no control over. It happens, but... Yeah, I can understand why would he do this. If you recall who Berger was at this time when the Spain settlement was entered, he essentially had a piece of property, a contract, a master franchisor agreement that he wanted to do away with. He wanted to give back. And part of the Spain settlement was that until all payments would be made, that he would hold on to this master franchisor agreement, essentially, and upon payment of all of the So this thing had value. It was substantial. Mr. Berger paid, I believe he testified or said the contract says $1.5 million. And at the time, OsteoStrong was attempting to resell this thing. So Mr. Berger's holding on to a piece of property and protecting it reputationally because a lot of these things, the brand, what this means, the services that are being provided has substantial value to the world. So someone who's holding on to something of value would have absolutely every desire to want to protect its reputation, protect its brand, because this is in the process of being sold back. So all I can say, without speaking for Mr. Berger, is that Mr. Berger had every opportunity to say, wait a second, I don't mean what 13b says. I want mine to look like 13a. Because if you look at 13a, that actually specifically limits the guarantees to the actions of the franchisor. 13b does not say that at all. In fact, it says any confidentiality, any non-disparagement. And so what ended up happening was the court began to look into this and said, no, no, no, what this actually really means is it's he is guaranteeing only the act, the activities or actions of Osteofit, and performed the analysis accordingly, looked at the issue and said, did Osteofit act? And did it act through Gary Rhodes? But what the court didn't do, going back to just my first point, is look at the fact that Gary Rhodes was a party to this agreement, and he breached. And that was the material value, as Mr. Zagrotsky wrote in his certification, which is undisputed, that was the value of the Spain settlement for him. So having torched the consideration, the failure of consideration, having not established a condition precedent to get to the ultimate execution, we now have all of the value of Gary Rhodes, who was an owner of Osteofit. The contract is quite clear. He cannot divest himself of his ownership interest until everything is sold back. But then all of the consideration of this, the non-disparagement, so that they can move forward with trying to resell this, this all gets evaporated, eviscerated by the actions of Mr. Rhodes prior to the final payment. Our client then issues a letter saying there was a breach, a material breach of this agreement. We are not following through with the last payment because we lost the value of this contract. Plus, you're now sitting on $1.2 million of our money, and if you look at the way the Spain settlement is structured, everything is set up in a way that looks for either material breach or full payment. So non-disparagement, all of these terms are built in such a way so as to prevent at least for a period of one year, and obviously for an extension past that, that no material breaches will occur with this agreement, especially non-disparagement. This was not a boilerplate term. This was the term for the agreement. This is what was actually negotiated for and the value that was created for the appellants. That's why it's right up front. That's why it's cited to continuously inside the Spain settlement agreement. But the most important point of all of this is if you look at the restrictive releases, the tolling agreements, the forbearance agreements, the reserve amounts that are being set, all of this is set up to assume no material breaches of the agreement, but that's exactly what occurred. So if you were to liken it to a situation where you're paying over time to purchase something and then between payment number one and the final payment, that thing goes away, a house, whatever it is, it's destroyed, a person can assert, hey, there's what I am going for, what I'm trying to purchase no longer exists and so I'm excused from future performance. That is not also to say that our client couldn't also say, listen, you guarantee non-disparagement. I've lost the value of this because of one of your owners and the actions that they took and a party to the agreement. And so you are now responsible to make me whole as a result of it. And by granting summary judgment on behalf of Osteofit and denying summary judgment to OsteoStrong under the circumstances, the court not only rewrote the non-disparagement provision to read inconsistently with how the court previously ruled on it in Docket 75 on the dismiss, but the court also wiped out the guarantee that's listed in 13B. There is another guarantee from both Mr. Berger, Charles Berger, and Ronald Berger, but that guarantee is much, much broader in terms of, much broader in scope, my apologies, I'm a little bit of a mover, so it's broader in scope and narrower for the parties. So it's like, hey, you know, we can't raise any objections, notwithstanding anybody settling the case out. Even if someone is not held responsible, we're the guarantors here, but it's only for the actions of the franchisee. That's the guarantee agreements. But very clearly there is a separate guarantee inside the primary obligation, and Ashcroft says a guarantee outside of the primary obligation is separate and distinct, and the court gave no credence to that at all and didn't even ask anybody what was the intention, what was 13B, what was supposed to happen with this thing. Is this a separate obligation or was it intended to be subsumed? The court just entered summary judgment even before discovery occurred inside the case. So the real issue that we need to decide is, is the 13B guarantee redundant of or in addition to the Exhibit A guarantee? Is that sort of the crux of it? Respectfully, that's one of the issues. The first issue is a critically important one as well, is does a party to a contract who breaches cause an excuse of further performance from a non-breaching party, my clients? Is there a condition precedent that is met? Is there a failure of consideration that occurred if the benefit of the bargain is vaporized by the actions of one of the parties to the suit? So one of the things, and I really need to bring this home, is there was a lot of ink that was spent on the fact that, you know, Gary Rhodes is no longer with the company. He doesn't think he's with the company. The Spain settlement document is the only document that really matters for purpose of the statement of intention, and the statement of intention is Gary Rhodes is an owner, his wife is an owner, and they cannot transfer their ownership interest until the last payment is issued. That's, if I could, I think that's paragraph five of the Spain settlement. That's why the contingent termination agreement was held in escrow until the last payment occurred. That's why Gary Rhodes' assignment was held in escrow, because it was always intended that either there's going to be a material breach, which is exactly what occurred, or there would be full payment. A material breach did occur by a party to the settlement agreement, and so that's another one of the bases that we're doing. Aside from that, separate and distinct is, were we barred from bringing our guarantee, because the primary obligation provides a very specific provision that allows for a guarantee by Ronald and Charles Berger for any breach of the non-disparagement provision, which is not at issue here, because there was a breach by a party. I see my time is up, Your Honor. If there's anything else I can answer, otherwise. Thank you. You've saved time for rebuttal. Thank you. Mr. McFarland, we'll hear from you. Thank you, Your Honor. Mitchell McFarland, on behalf of Osteofit and the Bergers. I have been litigating contracts for over 40 years. I have never in my life heard somebody say, we can take a guarantee agreement that's attached as Exhibit A and treat it like it doesn't even matter, and then just look at some words that talk about guaranteeing obligations under the agreement. And when we look at Exhibit A, it says, yes, we guarantee the obligations of Osteofit. Not anybody else. Wouldn't make any sense for us to guarantee the obligations of anyone else. How am I, Mr. Berger, supposed to guarantee that Mr. Rhodes won't do something? He doesn't work for me. I have no control over it. How am I, Mr. Berger, supposed to guarantee the actions of Zagrodzki? Under their interpretation, Zagrodzki can trash Osteostrong, his own company. And therefore, because we guaranteed it, we're in breach. Agreements are supposed to be interpreted in a reasonable manner. That's not reasonable. That's nonsense. And here, the court took care of that. The court, Judge Gilmour, in her order, in the record at 2666 and 2667, she answers the appellate's question. At best, what they're arguing is because we have this paragraph B, 13B, and Exhibit A, we can somehow create two different guarantees. Well, in other words, create an ambiguity. Judge Gilmour found the guarantee agreement says this is the entire agreement between the parties. That's the Exhibit A guarantee. That's on page 2667. She also held that if there is an ambiguity under Texas law, it must be resolved in favor of the guarantor. That's at page 2666, where she cites Haggard versus Bank of the Ozarks. So at best, they're trying to argue that somehow there's an ambiguity, which I disagree with. I think it's plain and simple. I agree to the guarantee I signed, which is Exhibit A. But they're trying to create it like it's, I'm going to have two different guarantees. And because of, and one of them says I guarantee obligations, and the other says I guarantee the obligations of osteofit, and somehow those things are different. And I, over here, I'm guaranteeing obligations of people I have nothing to do with. I have no control over them. And so that makes no sense whatsoever. And so I think Judge Gilmour got it right. And the law in Texas is clear that guarantees are to be strictly construed. They're to be, they're to be interpreted in favor of the guarantor. And here, that is exactly what happened. That is exactly what she did, and she did it correctly. Now, in this case, what's interesting about it is no one ever accused my client of doing anything wrong. There's no breach. They don't even allege that my client breached. There's not an allegation that osteofit did X and it was wrong, or that Mr. Berger did Y and it was wrong. They don't even allege that Mr. Rhodes had some sort of agency or employment relationship with us. He was a 5% shareholder. He and his wife had the other 5%. Which, on the signing of the settlement agreement, he agreed to relinquish all his rights. And as Judge Gilmour found, he relinquished his rights on July 13th or July 16th, 2019, and they're held in escrow. Now, they're held in escrow by osteofit's lawyer. And the only thing that causes the escrow to go away is OsteoStrong makes the payments. There's, if somebody breaches in the meantime, he doesn't get his shares back. There's nothing in there that says Mr. Rhodes will get them back, or Ms. Taylor will get her shares back. If somebody breaches, the assignment's still good, because he didn't breach the assignment. He said, here, I've given all my right and title and interest as of this date, and I'm signing it now, and I'm giving up my shares. So he did. So they didn't even allege that we breached it. They make no allegation that somebody, one of our agents or employees breached it. The only thing they have is that he was a shareholder at one time. They don't even cite a case that says a shareholder can bind a corporation. That's like me running a red light, and because I'm a shareholder, you can sue Kendra Morgan, because I ran a red light and had a wreck. That's crazy, and straight out of Texas law. Shareholders are not agents unless there's some other evidence that shows they are. And here, there was none. The other key thing about the termination of this agreement. They, and as you can tell by looking at the record, this was a fist fight between Rhodes and OsteoStrong. These people do not like each other. And OsteoFit and the burgers, hey, we got, we bought this franchise. It didn't work out for us. We agree, we'll give it back, and this was a franchise for Spain and Monaco and that part of Europe. We'll give it back. You pay us our money back. We're good. And we were over there minding our own business, not saying a word about anybody, and Rhodes is out there going wild according to their pleadings. And if you look at the record, all the back and forth and the contempt motions and all this stuff, that's not OsteoFit. I just want to get paid. That's all they wanted. And here, when they claim that because Mr. Rhodes breached, we can terminate him. Not according to the contract. Only a party, capital P, can give notice of termination. On the very first page of the contract, it defines who the parties are, OsteoFit and OsteoStrong. Mr. Rhodes is not a party. So even if Rhodes breached this agreement, which I'll grant that he, if you just assume what he said was disparaging because he never agreed that it was, in fact, he fought it all the way, ended up getting a settlement agreement from these guys and walking away, assume it was. That has nothing to do with us. And because it has nothing to do with us, they can't terminate the agreement as to us. And even if they were going to terminate the agreement, they have to follow the contract. They have to give us notice and give us an opportunity to cure. They didn't do that. They admit they didn't do that. And they say, oh, well, the contract says disparagement may not be able to be cured. Well, here it could have been. Because had they given us notice, we would have said, hey, wait a minute. Rhodes didn't work for us. He's over in London. My guys live in Spain. We don't have any, he's not in our office. We don't even, we don't know what he's doing. And we would have told him, he doesn't work for us. He's not speaking for us. He has no authority to speak for us. All of those facts are set out, undisputed, in the declaration of Mr. Berger and in the declaration of Mr. Rhodes that was filed with the motion for summary judgment. Rhodes and his wife had nothing to do with osteofit. Yes, they were shareholders. And yes, they assigned their shares back. But they didn't get any distributions. They never got any salary. They never were employees. They were never officers. They had nothing to do with this. So here, only a party could claim a default in termination against another party. Rhodes is not a party. So by that alone, OsteoStrong breached the settlement agreement when they said that it was terminated and they refused to pay us. We do have arguments back and forth about the interpretation of the disparagement clause. But I don't think that really matters. Because whatever Rhodes did, if that disparaged, if he's breaching because he disparaged OsteoStrong, fine. Sue Rhodes. Because that has nothing to do with my clients, which they did. But then they settled and paid him money. And the other arguments about the signature block I won't go into. So what we have here is a dispute over a guarantee agreement that, at best, is an ambiguity, which Judge Gilmour correctly pointed out. Under Fifth Circuit interpretation of Texas law, an ambiguity must be resolved in favor of the guarantor. And here it was. It was interesting in getting prepared for this argument. The most succinct argument is Judge Gilmour's opinion. After we went through all the trouble of doing briefs and everything, this weekend when I was getting ready, I read her opinion again and went, what? Why did we even file a brief? We should have just stapled this. It's right here. Everything, step by step, she just followed down the road. So I'm sure that's because of our briefs in the trial court. But she did set it out very clearly. And so here, nothing that Osteofit did was wrong. We just were waiting to get paid. We never got paid. So we didn't breach. They never alleged that we breached. They offered no evidence that we breached. The breach by Rhodes has nothing to do with Osteofit. Rhodes was not a party, capital P, as defined in the agreement. Therefore, his breach is not grounds to terminate. But instead, Osteostrom did breach by terminating. And we sent them all the requisite notice, which they don't even complain about. We followed the agreement to the letter when they tried to terminate against us. And we said, now, because of the way the agreement works, you now owe us $1.65 million, which they never paid, for which the court gave us judgment, plus attorney's fees and prejudgment interest. There was an argument about the notice of appeal not covering the motion to amend the judgment. It clearly did not. I'll just dismiss that in a couple of sentences. The notice of appeal said, we appeal the judgment. We appeal the granting of the summary judgment in favor of Osteofit and denying the summary judgment in favor of Osteostrom. That was it. Doesn't say anything that happened after the judgment. We appeal the judgment. So we don't think there's jurisdiction to even talk about the motion to amend. But the motion to amend was ridiculous anyway, because again, it gets back to Rhodes is a shareholder who had already signed his shares. If they're complaining about some bookkeeping entry that we did or didn't have in our records, it didn't matter, because we all agreed he was a shareholder in three or four different agreements, including the settlement agreement. And we all agreed that he would give his shares back, which he did. And so as Judge Hughes correctly found, it was irrelevant. So here we have no action or any act by the burgers to lead to a breach. We should, therefore, have gotten paid. Judge Gilmour, in her opinion, succinctly set everything out. And that judgment should be affirmed. And unless you have any other questions, I'll give back the rest of my time. Thank you, Mr. McFarland.  Thank you, Your Honors. A couple of things. Mr. McFarland indicated, hey, listen, at best, there's an ambiguity with regard to the language of the guarantee. The Fireman's Fund case, which we cite inside of our papers in the Fifth Circuit, and there's another case, I think it's Taurian versus Banneff, which I think we cite in our papers as well, both Fifth Circuit cases say, when there's an ambiguity  it's a fact issue. It is not for the court to say, hey, I'm just going to resolve this without adjudicating and making sure. I assume you agree just because lawyers disagree on the meaning of the contract, that doesn't make it ambiguous. There's something more than that. Yes. But we actually, in a lot of different ways, it's not just lawyers agreeing. It's the actual plain language of the contract itself, the agreement itself. So that sounds like you're making an argument that it's not ambiguous and in your favor. That's very different from arguing that it's ambiguous. What I'm saying is that the interpretation that we're advancing is one that's completely supported by the plain language of the agreement itself. In order to arrive at the alternative interpretation, you'd have to, to some degree, we'll say add words or at least torture the interpretation and say, no, no, no, that's not what he meant. What he actually meant was something else. So we have the plain language, what it says, what it means, and then you have this alternative interpretation with the injection of words that by itself is the creation of ambiguity. But I'm still saying, this is the guarantee, this is what it says, this is what our client wants. You're arguing for summary judgment in your favor and in the alternative of fact proceeding. I am not going to, I'll go no further than to say we believe that it was clear from the plain language what was intended under the contract. And I'll leave it at that, Your Honors. There's some discussion about these parties hate each other and it's really a fight between all of them. This has nothing to do with Osteofit except it does because Osteofit, the burgers, everybody entered into this agreement and this agreement had a meaning. It created promises, it created conditions for people to meet in order for the resolution to ultimately occur. I had heard counsel say, listen, everybody was sure that Mr. Rhodes was giving his interest back. That's not true. Under the very plain language of the Spain Settlement Agreement, under paragraph five, it says Mr. Rhodes and his wife are barred from transferring their ownership interest until a material breach or full satisfaction of these issues. So these are not strangers. Mr. Rhodes is not a stranger to this. It's not a person they have no control over and how could we guarantee it? It's what they did. Then we take every parent in America who co-signs their child's car loans and says, they're my kid, they're not me. I can't control them. That's what he agreed to do. He guaranteed it because Mr. Rhodes was a risk. And Mr. Berger, his son, Charles, and Ronald took the risk on themselves to say, we're not going to disparage you. Go out, you have at least a year, go try to sell this franchise agreement to someone else. We're recognizing it has value. And then between payment number one and the final payment, there's massive disparagement, multiple contempt orders, and it's nasty. They're calling people liars and everything, which damages the brand, damages the value of the very property that's supposed to be transferred back as part of the Spain settlement agreement. So again, going back to it, there's this destruction, a failure of consideration. What do you make of their argument that under your reading, Mr. Berger would then be liable, or both Bergers would be liable, for disparagement acts by Zagrodzki himself? So I think we addressed it in our papers as saying, there's still implied covenants that you have to live with. And if someone comes out and they go, hey, I'm going to disparage myself, you still have to go into a court of law and say, hey, I'm going to sue myself, I guess. And so you have potential standing issues. Is there actually a controversy if you're suing one side or the other? There's still all of the mechanisms that court used to address these issues. And that's not what was being said. In fact, the judge in- In fairness, the provision that you're referring to doesn't say disparagement by any party. Correct. It says any non-disparagement obligations. And I think the way- That's at least an implicit reference to Exhibit A. Yes, and what I, well- I don't think you mean yes. I don't think, what I mean to say is, I thought you were going to say it was back to the disparagement clause, because the disparagement clause specifically says, any party against any other party. And so you would have to have a violation of the non-disparagement provision, which Judge Gilmour, this is before the motion was dismissed, before the motion for summary judgment, said, it's any party against any party. So Mr. Zagrotsky could have left, people could have sold Osterstrom, all these things. It's not an absurd result to read the language of what was agreed to, compared to what else was said, and say, this is what the intention was of the parties. Thank you, Your Honors. I see my time is up. Any other questions? The case is submitted, and we are adjourned until tomorrow morning. Thank you, Your Honor. Thank you, Your Honor.